## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STEVE WOLFF, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:22-cv-03433 |
| | ) | |
| v. | ) | Hon. |
| | ) | |
| PATINA SOLUTIONS GROUP, INC. a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| | ) | |
| ROBERT HODGEN and ANTHONY | ) | |
| SEPICH | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## ORIGINAL COMPLAINT

Plaintiff Steve Wolff ("Wolff") brings a three-count complaint against Defendants Patina Solutions Group, Inc. ("Patina"), Robert Hodgen ("Hodgen"), and Anthony Sepich ("Sepich") (collectively, "Defendants"), alleging fraudulent concealment (Count I vs. Hodgen and Sepich; Count III vs. Patina) and negligent misrepresentation (Count II vs. Patina), all in connection with Mr. Wolff's former employment at Pipeline Foods, LLC ("Pipeline" or "Company").

## NATURE OF THE ACTION

1.     Mr. Wolff is an individual who resides in Illinois, holds an MBA from the University of Chicago Booth School of Business, and has a long career of working in high-level financial positions, including as Chief Financial Officer ("CFO") of a number of companies.

1

2.     Approximately in 2020, Mr. Wolff began a search for a permanent position as an in-house executive and was cultivating several promising, prospective offers from reputable companies. On or around February 2021, Defendant Patina contacted Mr. Wolff regarding a job opportunity as the CFO of Pipeline.

3.     As an agent of Defendant Patina, Joseph Solari induced Mr. Wolff to apply for this position, representing that it was a highly sought-after, competitive role that offered opportunities for long-term growth with a stable and successful Company. The reality is that Defendant Patina knew (or should have known) that this was all untrue, and Defendant Patina simply wanted to place Mr. Wolff and get its commission.

4.     Throughout March and April 2021, Defendants Hodgen and Sepich interviewed Mr. Wolff for the open CFO position. During these interviews, Defendants Hodgen and Sepich deliberately made false representations about Pipeline as a growing company, specifically, that the company was on the verge of signing a promising merger. Additionally, Defendants Hodgen and Sepich deliberately misled Mr. Wolff on information regarding the loans the company owed and a potential forbearance agreement. Furthermore, Defendants Hodgen and Sepich lied about whether the company had defaulted on these loans. Defendants Hodgen and Sepich also misled Mr. Wolff as to his potential tenure at the company stating this would be at least 18 months, yet knowing that Pipeline would not survive that long, at least not outside bankruptcy.

5.     During March and April 2021, Defendants Hodgen and Sepich withheld critical information from Mr. Wolff during the interview process. Defendants Hodgen and Sepich did not disclose the complete nature of Pipeline's financial status, which was grave. Even when Mr. Wolff asked Defendants Hodgen and Sepich about Pipeline's financial situation, they doubled down on their misrepresentations, reassuring Mr. Wolff there would be no issues with loans or lenders.

Furthermore, neither of the Defendants Hodgen or Sepich disclosed that the "impending merger" had been dead for months, long before interviewing Mr. Wolff. Additionally, Defendants Hodgen and Sepich knew it was impossible for Mr. Wolff to reach the bonus touted in Mr. Wolff's contract, but were silent.

6.      On or around April 2, 2021, Defendant Sepich offered Mr. Wolff the CFO position. The offer included an annual salary of $300,000. They also offered "a $100,000 bonus upon the company results reaching $6,000,000 EBITDA [earnings before interest, taxes, depreciation, and amortization] on a TTM [trailing twelve months] basis from the date of employment" and "profit interests." At the time he made the offer, Defendant Sepich knew it was extraordinarily unlikely (indeed, virtually impossible) for Pipeline to reach a $6 million EBITDA in 2021.

7.      Mr. Wolff, induced by the Defendants' representations, accepted this offer and started work on April 6, 2021. Mr. Wolff had other imminent, promising lucrative leads for permanent employment at successful and reputable companies that he decided to forgo, relying on the Defendants' misrepresentations and omissions. Only after starting work at Pipeline did Mr. Wolff realize the dire financial status of Pipeline and that the Defendants had fraudulently induced him.

## PARTIES

8.      Mr. Wolff is an individual who currently resides in Riverside, Illinois, located in Cook County and the Northern District of Illinois. Illinois is Mr. Wolff's true, fixed, and permanent home and principal establishment to which he intends to return whenever absent from it.

9.      Defendant Patina is an executive recruiting firm that Pipeline contracted for its CFO recruitment search.

10. Defendant Patina was incorporated in Delaware on or around May 9, 2008, and its Headquarters is located in Milwaukee, Wisconsin.

11. On or around April 1, 2022, Defendant Patina was acquired by Korn Ferry, a global organizational consulting firm and a corporation incorporated in Delaware on or around September 13, 1999.

12. Pipeline is a Delaware Limited Liability Company incorporated on or around January 23, 2017, with a headquarters in Minnesota. Pipeline *is not* a defendant in this matter.

13. Pipeline filed for bankruptcy on or around October 13, 2021, and Mr. Wolff was laid off from his employment on or around October 31, 2021.

14. Defendant Hodgen serves or served on the board of Pipeline and is the Managing Director of Amerra Capital Management, LLC, Pipeline's majority owner. Defendant Hodgen is an individual who currently resides in Rhinebeck, New York. New York is Defendant Hodgen's true, fixed, and permanent home and principal establishment to which he intends to return whenever absent from it.

15. Defendant Anthony Sepich is or was Pipeline's Chief Executive Officer ("CEO"). Defendant Sepich is an individual who currently resides in Bucyrus, Kansas. Kansas is Defendant Sepich's true, fixed, and permanent home and principal establishment to which he intends to return whenever absent from it.

16. Monte Bullock ("Bullock") is an individual and the former CFO at Pipeline who Pipeline terminated and replaced with Mr. Wolff.

17. Rabobank North America Wholesale ("Rabobank") is the bank that provided financing to Pipeline and to which Pipeline owed money.

18.     Compeer Financial ("Compeer") is another lender with whom Rabobank held an intercreditor agreement.

## JURISDICTION & VENUE

### *Subject Matter Jurisdiction*

19.     This Court has subject matter jurisdiction over the claims set forth in this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     Mr. Wolff is an Illinois resident and citizen of Illinois as alleged in paragraph 8 above.

21.     Defendant Patina is incorporated in Delaware with its principal place of business in Wisconsin and therefore is a citizen of Delaware and Wisconsin for diversity jurisdiction purposes

22.     Defendant Hodgen, as alleged in paragraph 14 above, is a citizen of New York for diversity jurisdiction purposes. Defendant Sepich, as alleged in paragraph 15 above, is a citizen of Kansas for diversity jurisdiction purposes.

23.     The amount in controversy is well in excess of $75,000. Defendants Hodgen and Sepich did not provide Mr. Wolff a realistic opportunity to work for his $100,000 bonus. Additionally, after he was laid off at the end of October, 2021, Mr. Wolff lost the opportunity to earn the remainder of his $300,000 annual salary, including for at least 18 months as promised, as any reasonable person would conclude based upon the representations Defendants made to Mr. Wolff.

24.     Furthermore, Mr. Wolff has suffered additional damages that exceed $75,000. Mr. Wolff gave up other profitable, long-term opportunities in deciding to work for Pipeline. Working

for Pipeline not only cost him hundreds of thousands in CFO salary he otherwise would have earned, but it harmed Mr. Wolff's career growth. Working for a bankrupt company (something he did not willingly want to do) put a black mark on his executive record. Additionally, this presents as a 'red flag' for future employers due to his short tenure and the outcome of Pipeline, confirming that Mr. Wolff's economic damages well exceed $75,000.

***Personal Jurisdiction***

25.     The Court may exercise jurisdiction over the Defendants because their activities reached into Illinois to transact business and induce an Illinois citizen to enter a contract or employment relationship, and therefore affected an Illinois citizen (namely, Mr. Wolff). The Defendants' activities were such that they may and must fairly be regarded as submitting themselves to jurisdiction of the courts in Illinois.

26.     The Court may exercise specific personal jurisdiction over the Defendants in this matter, as Mr. Wolff's claims arise out of the Defendants' activities reaching into Illinois.

27.     Further, jurisdiction of this suit is based on the Illinois "Long-Arm Statute," 735 ILCS 5/2-209 (a)(1), (2), and (7), in that the Defendants transacted business in Illinois, committed a tort in Illinois, and entered into a contract and commercial relationship or transaction with Mr. Wolff in Illinois.

28.     Additionally, jurisdiction is appropriate according to 735 ILCS 5/2-209(b)(4) where a Court can exercise jurisdiction in any action arising when a natural person or corporation does business within this state.

*Venue*

29.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Wolff's claims occurred in this District.

## FACTUAL ALLEGATIONS

*Mr. Wolff's Search for a Long-Term In-House Executive Position*

30.     Mr. Wolff has over 25 years of experience as an executive CFO. During Mr. Wolff's career as a CFO, he established a reputation for being accomplished, successful, and diligent.

31.     Mr. Wolff enjoyed being a CFO and was seeking in 2020 a permanent in-house executive role.

32.     Sometime in 2020, Mr. Wolff began searching for and cultivated several promising, imminent prospects of employment. For example, Mr. Wolff was nearing offers from a major U.S. subsidiary of a German private multinational conglomerate, and from one of the largest intelligent automation service providers in North America, based in Chicago. Mr. Wolff's competing prospects included the potential for long-term and professional growth. Unfortunately, Mr. Wolff declined those opportunities, instead joining Pipeline based on the Defendants' representations.

*Patina's Misrepresentations*

33.     Pipeline hired Defendant Patina as an executive recruiting firm, which included searching for candidates for the CFO position.

34.     Defendant Patina claims on its website (www.patinasolutions.com) that it offers "the largest network of executives and managers – delivering growth, performance and innovation that leaders can count on to achieve their goals." Defendant Patina further claims that it stands

apart from the competition because "clients get immediate and personal attention with a commitment to exceptional results."

35.     Defendant Patina also states that "we're meticulous about matching specific backgrounds and skills to your intentions." "Patina professionals bring a minimum of 25 years of experience, and their solutions are always tailored . . . fitting your organization." Defendant Patina further states that "we are obsessed with serving our clients while always demanding excellence from ourselves . . . *we never lose the passion we have for doing things the right way.*" (Emphasis added).

36.     On or around February 2021, Joseph Solari, an employee for Defendant Patina, contacted Mr. Wolff regarding the CFO Position at Pipeline. Mr. Solari at the time was a recruiter / headhunter working for Patina. As an employee and agent for Defendant Patina, Mr. Solari assured Mr. Wolff that the Pipeline CFO position was a highly sought-after, competitive role that offered the opportunity for long-term growth with the Company.

37.     Defendant Patina portrayed the Pipeline CFO position to Mr. Wolff as an ideal opportunity for Mr. Wolff, and convinced him to interview at Pipeline and eventually accept the position. Defendant Patina falsely told Mr. Wolff that Pipeline CFO was a highly sought and competitive position to influence Mr. Wolff to quickly consider the job to the exclusion of others or risk missing a superior opportunity.

38.     Defendant Patina failed to perform reasonable due diligence in evaluating Pipeline's CFO position viability for a long-term position, stability, and growth. Mr. Solari and Defendant Patina failed to perform any reasonable due diligence regarding the CFO position at Pipeline. Defendant Patina gave Mr. Wolff an inaccurate and false portrayal to lure him into considering Pipeline, to earn a commission from Pipeline when it hired Mr. Wolff.

8

39.     Defendant Patina failed to do things "the right way" and was not "meticulous" about matching Mr. Wolff's specific background and needs to the CFO position at Pipeline to earn a commission.

***Hodgen's & Sepich's Misrepresentations***

40.     Defendants Hodgen and Sepich conducted the interviews of Mr. Wolff on or around March 9, 11, and April 2, 2021 (the "Interviews").

41.     During the Interviews, Defendants Hodgen and Sepich falsely represented to Mr. Wolff that Pipeline was a growing company because Pipeline was on the verge of signing a promising merger with Healthy Food Ingredients ("HFI").

42.     Due to the supposed impending merger with HFI, Defendants Hodgen and Sepich informed Mr. Wolff that Pipeline needed a skilled and decisive CFO to grow Pipeline and navigate the merger. Defendants Hodgen and Sepich described Mr. Wolff's incoming job duties to include reorganizing aspects of the Pipeline's accounting and finance department, reworking its Enterprise Resource Planning ("ERP"), and managing costs, all ordinary CFO duties, including at successful companies with cash available to pay for beneficial organizational tasks.

43.     During the Interviews, Mr. Wolff asked the Defendants Hodgen and Sepich a series of specific, detailed questions about Pipeline's financial status. Mr. Wolff was also aware that Pipeline had some outstanding loans and asked Defendants Hodgen and Sepich if Pipeline had any challenges such as needing any forbearances.

44.     Defendants Hodgen and Sepich answered Mr. Wolff's questions with more falsehoods and failed to disclose critical material facts regarding Pipeline's financial status.

45.     Defendant Hodgen assured Mr. Wolff that he did not "have to worry about the lenders" and that Pipeline's loans would not present any concerns to Mr. Wolff because of

supposed covenant waivers. However, Mr. Wolff continued to probe Defendant Hodgen and asked whether Pipeline would need a forbearance agreement on any loans. Defendant Hodgen replied aggressively that this was not necessary. In truth, Defendant Hodgen knew that a forbearance agreement was likely necessary very soon.

46.     During the Interviews, Defendants Hodgen and Sepich falsely assured Mr. Wolff that Pipeline's lenders would wait until the fourth quarter of 2021 ("Q4 2021") before raising concerns regarding collection. Defendants Hodgen and Sepich also falsely informed Mr. Wolff that collection attempts would not jeopardize Pipeline's impending merger with HFI. Defendants Hodgen and Sepich failed to disclose to Mr. Wolff that they knew that Pipeline's lenders were unwilling to wait until Q4 2021.

47.     In response to Mr. Wolff's question on the status of Pipeline's loans, Defendant Sepich also falsely stated that Pipeline was "not in default." In truth, Pipeline was already in default and collection on at least one loan as of December 15, 2020, months before.

48.     During the interviews, Mr. Wolff made it clear to Defendants Hodgen and Sepich that the primary goal of his ongoing CFO search was to find a company with a long-term position and potential growth. Mr. Wolff asked Defendants Hodgen and Sepich multiple times if anything could derail Pipeline's growth plans. Defendant Hodgen stated that no matter what, Pipeline would employ Mr. Wolff for at least 18 months to integrate the company post-merger and further reassured Mr. Wolff that Pipeline's lenders would not be an issue. In truth, Defendant Hodgen was well aware that the company and the merger were in grave peril and would not survive long enough for Mr. Wolff to realize that 18-month promise.

49. On or around the April 2 Interview, Mr. Wolff asked Defendant Sepich if there was any other "critical information" he should know about before accepting the CFO position. Defendant Sepich again failed to disclose the multiple and severe issues Pipeline faced.

50. On or around the April 2 Interview, Mr. Wolff asked Defendant Sepich about the likelihood of reaching the $6,000,000 EBITDA to receive his $100,000 bonus. Defendant Sepich answered that it "is the same target as mine," implying that both Mr. Wolff's and Defendant Sepich's financial goals were aligned and affirming that Pipeline was on track to reach that target. In truth, Defendant Sepich knew and failed to disclose to Mr. Wolff, that Pipeline would never reach that target due to its ongoing financial troubles. Mr. Wolff would later see evidence that Defendant Sepich lied; after starting work, Mr. Wolff discovered an email between Defendant Sepich and Pipeline's former CFO, Mr. Bullock, dated March 18, 2021. The content of that email made clear that any bonus likely was an unobtainable goal.

51. Mr. Wolff relied on all these misrepresentations and accepted the CFO position at Pipeline. Mr. Wolff reported for his first day of work on April 6, 2021.

52. Mr. Wolff relied entirely and to his grave detriment on the Defendants' misrepresentations regarding Pipeline's financial status and the long-term prospects of the position. In doing this, Mr. Wolff passed up other job prospects that very likely would have meant he would currently be employed at a financially-sound company with a future. Mr. Wolff has been set back significantly and has not (to date) secured a permanent replacement CFO position.

**The True Financial Status of Pipeline**

53. Unknown to Mr. Wolff during the Interviews, Pipeline had been spiraling towards financial failure for months before Defendant Patina first contacted Mr. Wolff about the CFO

position. Mr. Wolff began to unravel the reality of Pipeline's dire financial status when, as part of his duties, he reviewed the former CFO's work email account.

54.     After starting work in April 2021, Mr. Wolff discovered that on or around December 15, 2020, Defendant Sepich was informed by Rabobank, one of its lenders, that "something needs to be done between now and December 31 if we want to avoid default under the credit facility". Between December 2020 through March 2021, Rabobank informed Pipeline that it would accelerate the outstanding loans *the very same month* that Defendants Hodgen and Sepich intended to hire Mr. Wolff. These facts contradict Defendant Hodgen's March 9, 2021, representation to Mr. Wolff that there was no need to "worry about the lenders" and that the "lenders were willing to wait until Q4 2021." As of December 15, 2020, Defendant Sepich knew that Pipeline was in default and collection would not wait until Q4 2021. Sepich lied to Mr. Wolff about all of this.

55.     After starting work in April 2021, Mr. Wolff discovered that on or around December 30, 2020, Mr. Bullock advised Defendant Sepich that the merger with HFI was untenable and that no reasonable investor would have recommended the merger due to the negative capital and equity which HFI suffered. Mr. Bullock informed Defendant Sepich that HFI's negative working capital of $1.7 million combined with its negative equity were such that no reasonable investor would recommend the merger. As a result, the HFI merger was dead months before Defendants Hodgen and Sepich touted the impending merger to Mr. Wolff as a carrot on the stick to accept an offer for the CFO position. They lied to Mr. Wolff about all of this.

56.     After starting work in April 2021, Mr. Wolff discovered that on or around January 4, 2021, Pipeline's lender problems continued to escalate. Rabobank informed Pipeline that it

would "present the file with restrictions on dividends and investments for the duration of the [loan] extension (i.e., until April) as a way to say that cash should be preserved."

57.     After starting work in April 2021, Mr. Wolff discovered that on or around January 7, 2021, Rabobank's attorney idenfitied: "the existence of Specified Defaults listed in the attached amendment," showing that Rabobank was moving to eliminate any further risk from Pipeline.

58.     After starting work in April 2021, Mr. Wolff discovered that on or around January 13, 2021, Mr. Bullock informed Rabobank that [Pipeline] "was wanting to borrow a Million dollars this week but don't believe [Pipeline] can since the waiver and Amendment haven't been approved because [Pipeline is] still in default on the facility." Mr. Bullock copied Defendant Sepich on this email. Therefore, Defendant Sepich knew that Pipeline was in default and lied about this to Mr. Wolff during the Interviews.

59.     After starting work in April 2021, Mr. Wolff discovered that on or around February 3, 2021, Defendant Sepich sent an email to the senior management team stating that "we are at a critical juncture." A few days later, on or around February 9, 2021, Defendant Sepich called for a team meeting and emphasized that "[n]ormally a team this broken would go to a multi-day offsite to address the issues." These statements underscore Defendant Sepich's knowledge that the future of Pipeline was bleak and that the probability that a successful 18-month tenure was remotely realistic was a lie.

60.     After starting work in April 2021, Mr. Wolff discovered that on or around February 7, 2021, Defendants Hodgen and Sepich manipulated Pipeline's financial projections to show its lenders that Pipeline's projections were sound. Some of the fabrications Pipeline told its lenders, and the board included a statement from Defendant Sepich to Pipeline executives regarding the

projections "I think it is important that we answer the questions, otherwise we run the risk of looking like we created a bunch of work in an effort to create a smokescreen."

61.     After starting work in April 2021, Mr. Wolff discovered that on or around February 16, 2021, Defendant Sepich suggested to Defendant Hodgen to use "booked data at our projected 2021 margin" to *inflate projections*.

62.     After starting work in April 2021, Mr. Wolff discovered that on or around March 3, 2021, Mr. Bullock, after spending months working to improve the business, reported to Defendant Sepich that Pipeline, in the first seven months of its fiscal year (from July 2020 to January 2021), had a net operating loss of $7.8 million.

63.     After starting work in April 2021, Mr. Wolff discovered that on or around March 3, 2021, when Defendants Hodgen and Sepich began interviewing Mr. Wolff, Rabobank's December warnings came to fruition. On or around March 16, 2021, Defendant Sepich conceded that the default to Rabobank and Compeer was unavoidable and that "March results will be in focus for both [covenants] and essentially sets up April 30 as the critical date—potential cross covenant violation [ ]." This was confirmed by Mr. Bullock on or around March 23, 2021 that "[W]e will be over $3MM short on the current ratio[ ] for Compeer." and that Rabobank intended to "freeze the credit line". Bullock further suggested that:

> "I think we need to tell them that we were on the wrong side of the market moving up. We were short and the market moved up and that has impacted our financial performance. . . . I still believe that this is what kicked our butt this past fall. If they are questioning the business model, let's call a spa[de] a spa[de] and not have them second guessing the concept and business model. I think that it is a bigger risk to have them lose faith in the business, than to let them know that we lost money with our position."

64.     On or around this time Pipeline terminated Mr. Bullock and subsequently hired Mr. Wolff for the company's CFO position. On or around April 13, 2021, one week into Mr. Wolff's tenure at the company, Pipeline was presented a declining letter notice.

65.     Mr. Wolff worked diligently for Pipeline as its CFO, performing excellent work and doing the best any CFO could do for a company in grave financial condition. Despite Mr. Wolff's best efforts, on July 8, 2021, Pipeline filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the District of Delaware, No. 21-110002-KBO. Mr. Wolff continued diligent and excellent work for Pipeline until his position was eliminated and he lost his job, laid off on or about October 31, 2021.

66.     Following Mr. Wolff's departure, Pipeline's bankruptcy counsel baselessly has threatened Mr. Wolff with an emergency injunction and sanctions if he makes demands for payment or takes legal action against Defendants Hodgen and Sepich for their fraud, alleging that such would violate the automatic stay, which counsel claims should extend to non-debtor Defendants who are officers and directors of the company.

67.     Mr. Wolff has taken these threats seriously.  After careful review and consideration of the relevant and applicable case law and statutes, Mr. Wolff has filed this lawsuit. Any claim that the automatic stay applies to Defendants Hodgen and Sepich is ill-based and incorrect as set forth below.

68.     First, officers and directors of a debtor company are generally not considered one with the debtor. Thus, officers and directors generally do not benefit from the protection of the automatic stay. "Unusual circumstances" are required for bankruptcy courts to stay proceedings against non-debtor Defendants. No such unusual circumstances exist here to extend the stay to non-debtor officers and directors.

69.     Second, a Court may extend the automatic stay to non-debtor Defendants if those Defendants are difficult if not impossible to distinguish under the circumstances, or stay protection is essential to holding proper bankruptcy proceedings. Defendants Hodgen and Sepich are not parties to Pipeline's bankruptcy proceeding and they should be responsible for their individual misconduct, not escape it by an argument for automatic stay.

70.     Third, the party invoking the stay under unusual circumstances has the burden of showing that the unusual circumstances exist. No such circumstances exist here.

71.     Finally, Pipeline is *not* a Defendant in *this* case. More importantly, both Defendants Hodgen and Sepich are named Defendants here, based on their individual misconduct. If Mr. Wolff obtains a judgment, he will take measures to collect it from the personal assets of Defendants Hodgen and Sepich. Such a judgment will be *for fraud* against Hodgen and Sepich, making it unlikely or impossible for them to assert any claim that they should be indemnified by any asset of the bankrupt Pipeline.

72.     In sum, the claims herein, and allegations made in support are not presented for any improper purpose, such as to harass, cause unnecessary delay, or increase the cost of litigation. There is nothing here that should be before the bankruptcy court, and no automatic stay should extend to Defendants Hodgen or Sepich. The claims, defenses, and other legal contentions herein are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. The factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## COUNT I

**Fraudulent Concealment Claim Against Defendants Hodgen and Sepich**

73.     Mr. Wolff restates and realleges each of the foregoing paragraphs as if fully incorporated herein.

74.     During the Interviews, Defendants Hodgen and Sepich falsely represented and omitted key material information about the Pipeline CFO position and failed to disclose critical information about the dire financial condition of Pipeline, despite repeated attempts by Mr. Wolff to acquire this information.

75.     Defendants Hodgen and Sepich falsely represented and omitted key material information to Mr. Wolff about Pipeline's supposedly sound financial status and Pipeline's need for a CFO that could navigate Pipeline through a merger with HFI.

76.     During the Interviews, Defendants Hodgen and Sepich falsely represented and omitted key material information to Mr. Wolff regarding Pipeline's financial status when informing Mr. Wolff that the lenders for Pipeline's outstanding loans would wait until Q4 of 2021 and the impending HFI merger is complete to begin collecting.

77.     During the Interviews, Defendant Hodgen falsely represented and omitted key material information about Pipeline's financial status when he reassured Mr. Wolff that he would not have to worry about Pipeline's lenders and Pipeline did not need any forbearance agreements.

78.      Defendant Hodgen falsely represented to Mr. Wolff that Pipeline would need his services as CFO for at least 18 months to navigate Pipeline through the merger with HFI, despite Defendant Hodgen's prior knowledge that the HFI merger was dead as of late 2020 or early 2021.

79.     Furthermore, during the Interviews, Defendant Sepich falsely represented and omitted material facts about Pipeline's financial status when it informed Mr. Wolff that the

impending merger with HFI was not in jeopardy and Pipeline was not in default on its loans at the time. In truth, Mr. Bullock informed Defendants Hodgen and Sepich that Pipeline was in default on its loans as of January 13, 2021.

80.     Defendant Sepich misrepresented Pipeline's financial status to lure Mr. Wolff into signing the April 2, 2021, offer letter when he told Mr. Wolff that Pipeline was on track to achieve $6 million EBITDA. Mr. Wolff's bonus was conditioned on Pipeline reaching this threshold and was a material fact in Mr. Wolff's decision to accept the offer.

81.     Additionally, Defendants Hodgen and Sepich falsely represented and omitted material information regarding its need for a CFO to navigate Pipeline through a merger with HFI. Defendants Hodgen and Sepich created a false story regarding an impending merger with HFI to lure Mr. Wolff into accepting the CFO position at Pipeline.

82.     Defendants Hodgen and Sepich had a duty to disclose complete and accurate information about the CFO position and financial status of Pipeline. Specifically, Defendants Hodgen and Sepich had an influence over Mr. Wolff and induced him to accept the CFO position at Pipeline.

83.     Mr. Wolff trusted the Defendants Hodgen and Sepich to be informed and disclose accurate information about the long-term growth and financial stability of Pipeline. Mr. Wolff trusted Defendants Hodgen and Sepich to provide accurate information regarding Pipeline's financial status (including loans and defaults), the likelihood of obtaining his bonus, and his tenure at Pipeline.

84.     During the Interviews, Defendants Hodgen's and Sepich's failure to disclose complete and accurate information about Pipeline's CFO position and financial status to Mr. Wolff rendered the parties' transaction inherently unfair.

85.     Defendants Hodgen and Sepich knew that their actions would deceive and induce Mr. Wolff to accept the CFO position at Pipeline.

86.     Defendants Hodgen and Sepich knowingly and intentionally failed to disclose material information to induce Mr. Wolff into accepting the CFO position at Pipeline.

87.     Mr. Wolff relied to his detriment on the Defendants Hodgen's and Sepich's misrepresentations and failures to disclose.

88.     Mr. Wolff's reliance on the Defendants Hodgen's and Sepich's representations and failures to disclose was reasonable and justifiable because of the relationship between the Parties. Given Pipeline's status as a private company, Mr. Wolff had no reasonable way to ascertain any information about Pipeline's financial status, thus emphasizing the critical role and duty that Defendants Hodgen and Sepich owed in providing accurate information to Mr. Wolff and not lying to him.

89.     Specifically, Mr. Wolff had no reason to doubt that Defendants Hodgen's and Sepich's statements about the CFO position or the financial status of Pipeline were correct and accurate. Mr. Wolff had no reason to doubt that Defendants Hodgen and Sepich were informed or to think they had not taken proper investigative measures to ensure the accuracy of their information.

90.     Had Defendants Hodgen and Sepich told Mr. Wolff the truth regarding any aspect of Pipeline's financial status, such as the HFI merger being dead, lenders accelerating Pipeline's loans, loans in default, or the EBITDA and bonus goals being unobtainable, Mr. Wolff would have ceased interviewing. Mr. Wolff would have continued his executive search and found a different in-house executive position at another company taking advantage of other opportunities he had at hand.

91.     Mr. Wolff suffered considerable damages including: loss of income regarding his $300,000 annual salary with Pipeline, loss of obtaining bonus regarding his $100,000 potential bonus with Pipeline, damage to his reputation, and damage to his long-term career goals. The damages suffered by Mr. Wolff, were a direct and proximate result of relying on Defendants Hodgen's and Sepich's misrepresentations and omissions.

92.     Defendants Hodgen's and Sepich's intentional omission and false representations induced Mr. Wolff's reliance and were the proximate cause of Mr. Wolff's damages, which Mr. Wolff would not have sustained but for the Defendants' fraud.

93.     Mr. Wolff is entitled to an award of actual damages to be proven at trial, and punitive damages for the Defendants Hodgen's and Sepich's fraudulent concealment.

## COUNT II

### Negligent Misrepresentation against Defendant Patina

94.     Mr. Wolff restates and realleges each of the foregoing paragraphs as if fully incorporated herein.

95.     Defendant Patina at least negligently misrepresented and concealed material facts regarding the Pipeline CFO position being "highly sought-after" and a position with long-term opportunities that fit Mr. Wolff's search.

96.     As an executive search firm, Defendant Patina is in the business of supplying information to candidates about potential matches with open executive positions, which includes providing accurate information to potential candidates based on the needs of both client and candidate.

97.     Defendant Patina blindly endorsed Pipeline and failed to perform any reasonable due diligence in verifying that the CFO position at Pipeline was "highly sought-after" and offered long-term opportunities.

98.     Defendant Patina intended that its misrepresentations of the CFO Pipeline position would lure Mr. Wolff into considering and accepting the CFO position, thereby earning Defendant Patina a substantial commission from Pipeline.

99.     Mr. Wolff relied on Defendant Patina's representations, expertise, reputation, unique knowledge, and recommendation of the CFO position at Pipeline. He focused his executive search efforts on Pipeline to the exclusion of other potential openings in reliance on Defendant Patina's representations.

100.     Mr. Wolff ultimately accepted the CFO position at Pipeline on April 2, 2021. Mr. Wolff's reliance on Defendant Patina's representations resulted in Mr. Wolff taking a CFO position for a company with ongoing dire financial issues that jeopardized any potential for long-term opportunities and growth.

101.     Had Defendant Patina provided Mr. Wolff with accurate information regarding how unattractive and not sought after the open CFO position at Pipeline was; and how Pipeline's financial troubles would likely impact the long-term opportunities, Mr. Wolff would have found a reasonably suitable in-house executive position at another company.

102.     Defendant Patina was in the business of communicating information accurately and completely, and had a duty to Mr. Wolff to communicate accurate information about the CFO Pipeline position.

103.     As a result of Defendant Patina's negligence to disclose accurate information, Mr. Wolff has been damaged in an amount to proven at trial.

## COUNT III

### Fraudulent Concealment Claim Against Patina

104.     Mr. Wolff restates and realleges each of the foregoing paragraphs as if fully incorporated herein.

105.     On or around February 2021, Defendant Patina falsely represented and omitted key material information about the CFO position at Pipeline to Mr. Wolff. Specifically, Defendant Patina, through its employee and agent Mr. Solari, stated that the CFO position was a highly sought-after, competitive role that offered the opportunity for long-term growth with the Company. Defendant Patina failed to mention that Pipeline's collapse was imminent.

106.     Defendant Patina did not adequately investigate the open CFO position at Pipeline and hence blindly endorsed the CFO position to Mr. Wolff. Defendant Patina misrepresented to Mr. Wolff that the Pipeline CFO position would provide an opportunity for long-term growth. It was all a fiction.

107.     Defendant Patina's fraudulent concealment induced Mr. Wolff to interview and work for Pipeline. Mr. Wolff believed that Pipeline was a sound and stable company with no dire financial problems that would impede his long-term professional growth. Defendant Patina propped up the CFO position as highly sought after to pressure and give Mr. Wolff a sense of urgency and scarcity to consider the position.

108.     Defendant Patina knew that Mr. Wolff would rely on its recommendation regarding the Pipeline CFO opportunity and further rely on its unique experience and knowledge in executive recruiting. Mr. Wolff depended on Defendant Patina's providing accurate statements regarding the CFO position at Pipeline and its prospects for a long-term position and growth.

109.     Mr. Wolff justifiably relied on Patina's representations, expertise, reputation, unique knowledge, and recommendation of Pipeline. As a result, Mr. Wolff accepted an invitation to interview for the Pipeline CFO position and accepted the position on April 2, 2021.

110.     Mr. Wolff and Defendant Patina shared a relationship of special trust such that Defendant Patina had influence over Mr. Wolff. Specifically, Defendant Patina was in a position of superior knowledge, experience, and expertise regarding executive searches and its client, Pipeline. Defendant Patina's unique and special knowledge allowed it to provide information about Pipeline that Mr. Wolff could not reasonably ascertain for himself.

111.     Defendant Patina's willful blindness and endorsement of Pipeline to Mr. Wolff induced Mr. Wolff to focus his executive search efforts on Pipeline to the exclusion of other potential CFO positions.

112.     Had Defendant Patina told Mr. Wolff the truth regarding how unattractive and not sought after the open CFO position at Pipeline was; and how Pipeline's financial troubles would likely impact the long-term opportunities, Mr. Wolff would have found a reasonably suitable in-house executive position at another company.

113.     Defendant Patina's actions proximately caused Mr. Wolff damage in an amount to be proven at trial. But for Defendant Patina's fraudulent misrepresentations and omissions, Mr. Wolff would have continued his search and found a reasonable and suitable CFO position at one of the alternatives he had at hand.

## DEMAND FOR JURY TRIAL

114.     Mr. Wolff demands that all causes of action herein be tried before a jury. The jury fee has been paid with the filing of the Complaint.

## **PRAYER FOR RELIEF**

115.     WHEREFORE, Mr. Wolff respectfully prays for judgment against all Defendants, severally and jointly as follows:

  a.  Actual, direct, consequential, and out-of-pocket damages resulting from Defendants' fraud, non-disclosure, and negligent misrepresentation in an amount to be proved at trial;

  b.  Punitive damages as allowed by law;

  c.  Pre-judgment interest as provided by law;

  d.  Post-judgment interest as provided by law;

  e.  Court costs and attorney's fees to the extent provided under law;

  f.  All other relief to which Mr. Wolff may be entitled in equity or at law.


Dated: June 30, 2022

Chicago, IL

Respectfully submitted,

Fuksa Khorshid, LLC


  */s/ William E. Meyer, Jr.*
William E. Meyer, Jr.
Blake W. Buether
200 West Superior Street, Suite 410
Chicago, Illinois 60654
312-266-2221
william@fklawfirm.com
*Attorney for Plaintiff*
*Steve Wolff*